97 N.Y.2d 295 (2001)
766 N.E.2d 914
740 N.Y.S.2d 252
FREDERICK F. BUECHEL et al., Individually and as Trustees of Trusts Entitled BIOMEDICAL ENGINEERING TRUST, Respondents,
v.
JOHN N. BAIN et al., Appellants, et al., Defendants.
Court of Appeals of the State of New York.
Argued October 16, 2001.
Decided December 20, 2001.
*297 Simpson Thacher & Bartlett, New York City (Robert F. Cusumano, Roy L. Reardon, David E. Vann, Jr., Bryce L. Friedman and George S. Wang of counsel), and Wilson, Elser, Moskowitz, Edelman & Dicker, L. L. P. (Thomas W. Hyland and Richard E. Lerner of counsel), for appellants.
*298 Solomon, Zauderer, Ellenhorn, Frischer & Sharp, New York City (David N. Ellenhorn and Emily Stern of counsel), for respondents.
Chief Judge KAYE and Judges CIPARICK, WESLEY, ROSENBLATT and GRAFFEO concur with Judge SMITH; Judge LEVINE dissents and votes to reverse in a separate opinion.

*299 OPINION OF THE COURT
SMITH, J.
The primary issue before this Court is whether parties should be precluded from relitigating the validity of fee arrangements determined to be illegal in an earlier action, when they were in privity with the person against whom the issue was decided. We conclude that collateral estoppel bars relitigation.
Plaintiffs, Frederick F. Buechel, an orthopedic doctor and Michael J. Pappas, a mechanical engineer, are the inventors of a prosthetic shoulder device called the floating center prosthetic joint. They retained the firm of Bain, Gilfillan & Rhodes, P. C. "to undertake the preparation and prosecution of a patent application covering the invention on a contingency basis." The fee agreement, executed on November 12, 1974, provided that the law firm would receive a one-third interest in monies, profits or income resulting from the invention.
In July 1975, the parties formalized their relationship and incorporated Biomedical Engineering Corporation (BEC) in New Jersey. The attorneys' interests in the corporation mirrored their fee agreement. Plaintiffs each held one third of the shares of the corporation, with the remaining one-third interest divided equally among Bain, Gilfillan and Rhodes. Plaintiffs, who had continued to collaborate on development of prosthetic devices, assigned to BEC their interests in the floating center prosthetic joint and any future prosthetic devices invented by them. Significantly, Rhodes failed to advise plaintiffs of the potential for conflicts of interest that could result from converting the one-third interest in a single invention into a one-third equity interest in a corporation that would exploit all future inventions. A dispute subsequently arose among the attorneys, resulting in Rhodes' departure from the firm in December 1981. Defendants Bain and Gilfillan, however, continued to render legal services to plaintiffs on BEC matters.
In 1983, for tax purposes, BEC was dissolved, and its assets were transferred to a newly formed entity, the Biomedical Engineering Trust (Trust I), also with plaintiffs as trustees. *300 Again, the trust agreement continued the parties' prior arrangement. The three attorneys, as shareholders of the dissolved corporation, received equivalent equity interests in the trust. In 1984, a second trust, the Biomedical Engineering Trust II (Trust II) was created, again with plaintiffs as trustees, and it held the marketing rights to a self-centering hip device. While neither Bain nor Gilfillan held an interest in Trust II, their former partner, Rhodes, provided patent protection services to the entity.
In 1987, after a dispute arose over trust distributions, Rhodes commenced an action against plaintiffs as trustees to recover monies that the trustees allegedly improperly paid themselves. In response to plaintiffs' motion to dismiss for failure to join all the trustees, Rhodes amended his complaint, adding defendants Bain and Gilfillan in their capacity as trust beneficiaries. In 1991, four years after Rhodes commenced the action, plaintiffs asserted counterclaims against Rhodes for breach of fiduciary duty and malpractice, alleging among other things that "the [a]greements were unfair" and that Rhodes "while acting as their attorney, induced [plaintiffs] to enter into the unfair [a]greements by taking unfair advantage of his fiduciary capacity and superior knowledge * * * by deceiving [plaintiffs] as to the value of his and/or the [l]aw [f]irm's [s]ervices and by failing to disclose * * * the value of the approximate one-third interest relinquished by [the inventors]." Plaintiffs additionally asserted malpractice on the part of Rhodes in that he represented that he and his law firm were qualified, competent and experienced in patent and business affairs, which representations were false. Plaintiffs did not, at that time, name defendants as adverse parties. In a later letter sent to defendants, Rhodes' attorney made clear that if the counterclaims were established, recovery for the counterclaims "[would] be subject to contribution by [defendants,] [Rhodes'] former partners."
Recognizing their unity with Rhodes in regard to the validity of the challenged fee arrangement, on March 12, 1992, Bain wrote plaintiffs that he was unclear as to how the counterclaims could be narrowly construed solely against Rhodes. Bain wrote that he and Gilfillan were "concerned that the counterclaims could be interpreted broadly to assert overreaching either by the law firms in which Rhodes, Gilfillan and I were involved or, at the least by Rhodes as a partner or agent of those law firms, thereby potentially extending the consequences of the alleged wrongdoing by Rhodes to Gilfillan and myself."
*301 On January 5, 1995, after a number of disputes, Gilfillan wrote plaintiffs:
"[W]ith the trial date apparently becoming imminent, you have placed John [Bain] and I [sic] in a position where we have to deal with the question of whether or not we must become active in the Rhodes' litigation to protect our rights, vis-à-vis the position of the Trustees regarding legal fees. I would certainly not like to have to do that. However, I will not waive any rights. We are gravely concerned that if we do not raise the issue in this litigation or otherwise provide for preservation rights, we will be estopped in the future from challenging the Trustees on this highly improper conduct. Needless to say, we cannot let this happen."
On January 10, 1995, plaintiffs fired Bain and Gilfillan and moved to amend their counterclaims in the Rhodes action to assert specific claims against them. Defendants opposed the motion. Supreme Court denied plaintiffs' motion because they failed to offer an acceptable excuse for the delay.
Plaintiffs then commenced the present action against defendants Bain and Gilfillan, alleging breach of fiduciary and ethical obligations and legal malpractice. Plaintiffs sought the termination of trust payments to defendants and the turnover of trust files. At defendants' request, Supreme Court stayed the action pending resolution of the Rhodes action. In support of their request for a stay, defendants submitted an affidavit to the court arguing:
"Because of the similarity of the underlying facts and transactions in both the Rhodes action and this one, proceeding with this action at this time would be duplicative and a waste of judicial resources. Indeed, a decision in the Rhodes case may estop or bar certain claims in this action."
In 1998, following a bench trial, Supreme Court determined in the Rhodes action that the fee arrangement between plaintiffs and their original counsel, the firm of Bain, Gilfillan & Rhodes, was invalid. The court found that, from the outset of the attorney-client relationship, there had not been full disclosure regarding the possibility of the firm's conflict of interest. The court further found that plaintiffs were never advised to seek independent counsel before entering into a business *302 relationship with their attorneys, and that Rhodes had "exploited his clients through affirmatively pursuing a business relationship with them absent full disclosure." The court noted that Rhodes' extensive ethical violations constituted serious breaches of his fiduciary obligation "not [to] take advantage of his superior knowledge and position," and that he failed to inform his clients that he could be discharged as their attorney at any time. Consequently, Supreme Court held that the fee agreement, from which Rhodes derived his interest in the trusts, was unethical and unenforceable, and in its decision the court ordered that "the trust agreements are rescinded."
The Appellate Division affirmed, concluding "neither the initial arrangement nor its subsequent incarnations were entered into upon adequate disclosure * * * of other possible fee arrangements and potential conflicts of interest, or with the aid of independent counsel * * *. Rescission of the parties' arrangements ab initio, with payment to plaintiff in quantum meruit for his services, is an equitable result * * *" (258 AD2d 274 [1999] [citations omitted]). This Court declined to hear the appeal (93 NY2d 806 [1999]).
By order dated February 5, 1998, Supreme Court lifted the stay in the present suit, and on March 23, 1998, defendants Bain and Gilfillan answered the complaint and asserted counterclaims, seeking their reinstatement as beneficiaries of the trust. Defendants alleged that plaintiffs "repudiated their agreements with Bain and Gilfillan and now contend that all such agreements are void ab initio." Both parties moved for summary judgment. Supreme Court granted plaintiffs' motion for partial summary judgment, rescinding and terminating defendants' equity interests in Trust I and ruled the fee agreements between plaintiffs and defendants unenforceable, ab initio, "because they were entered into in violation of the ethical duties owed to plaintiffs." The court directed defendants to return to plaintiffs all monies distributed less reasonable attorneys' fees.
The court explained that the issue of rescission was thoroughly litigated in the Rhodes action, and that defendants had elected to elude every opportunity to participate actively. Supreme Court determined that defendants were in privity with Rhodes, that they "actually did cooperate somewhat in [his] trial preparation," and that on "this score absolutely no adverse relationship existed between them." Finally, the defendants had not shown that their failure to more fully participate in the Rhodes action prejudiced them or affected its *303 outcome. The court stated, "judging by the context of defendants' affidavits in the present action, their testimony in the Rhodes action, even assuming its veracity, would not have met the standard of professional conduct applied in the prior case, having failed to allege, inter alia, that plaintiffs were informed their attorneys could be replaced without penalty."
The Appellate Division unanimously affirmed. The Court rejected the contention that "Bain and Gilfillan were merely nominal parties to the Rhodes matter," explaining that:
"The issue presented for decision in Rhodes was whether or not Buechel and Pappas, as trustees, were required to make payments to an attorney whose rights as a trust beneficiary derived from the fee agreement between Buechel and Pappas, individually, and the law firm of Bain, Gilfillan & Rhodes. This action similarly addresses the status of attorney-beneficiaries whose rights to receive proceeds from the trust are predicated on the identical fee agreement" (275 AD2d 65, 72 [emphasis in original]).
On motion for reargument, defendants contended that the claims against them for nullification of the fee agreement were not precluded. They also argued, for the first time, that plaintiffs were barred from bringing suit against them under the doctrine against claim splitting. The Appellate Division denied the reargument motion and certified the following question to this Court: "Were the orders of the Supreme Court, as affirmed by this Court, properly made?" We conclude that they were.

Analysis
The equitable doctrine of collateral estoppel is grounded in the facts and realities of a particular litigation, rather than rigid rules. Collateral estoppel precludes a party from relitigating in a subsequent action or proceeding an issue raised in a prior action or proceeding and decided against that party or those in privity (Ryan v New York Tel. Co., 62 NY2d 494, 500 [1984]). The policies underlying its application are avoiding relitigation of a decided issue and the possibility of an inconsistent result (D'Arata v New York Cent. Mut. Fire Ins. Co., 76 NY2d 659, 664 [1990]).
Two requirements must be met before collateral estoppel can be invoked. There must be an identity of issue which has necessarily *304 been decided in the prior action and is decisive of the present action, and there must have been a full and fair opportunity to contest the decision now said to be controlling (see, Gilberg v Barbieri, 53 NY2d 285, 291 [1981]). The litigant seeking the benefit of collateral estoppel must demonstrate that the decisive issue was necessarily decided in the prior action against a party, or one in privity with a party (see, id.). The party to be precluded from relitigating the issue bears the burden of demonstrating the absence of a full and fair opportunity to contest the prior determination.
The doctrine, however, is a flexible one, and the enumeration of these elements is intended merely as a framework, not a substitute, for case-by-case analysis of the facts and realities. "In the end, the fundamental inquiry is whether relitigation should be permitted in a particular case in light of * * * fairness to the parties, conservation of the resources of the court and the litigants, and the societal interests in consistent and accurate results. No rigid rules are possible, because even these factors may vary in relative importance depending on the nature of the proceedings * * *" (see, Staatsburg Water Co. v Staatsburg Fire Dist., 72 NY2d 147, 153 [1988] [citations omitted]).
Applying these principles, we conclude that defendants are barred from now once again litigating the validity of a trust agreement that wasafter extensive pretrial and trial proceedings involving themfound to be invalid.
In determining whether collateral estoppel applies here, the initial question is whether defendantsparties in the Rhodes action who were not named in the plaintiffs' counterclaim should, nevertheless, be bound by the determination rescinding the trust. Because for purposes of collateral estoppel, defendants were in privity with their former law partner Rhodes as to the validity of the fee arrangements, we conclude they should be bound.
In the context of collateral estoppel, privity does not have a single well-defined meaning (Matter of Juan C. v Cortines, 89 NY2d 659, 667 [1997]). Rather, privity is "`an amorphous concept not easy of application' * * * and `includes those who are successors to a property interest, those who control an action although not formal parties to it, those whose interests are represented by a party to the action, and [those who are] coparties to a prior action'" (id., at 667-668 [citations omitted]). In addressing privity, courts must carefully analyze whether *305 the party sought to be bound and the party against whom the litigated issue was decided have a relationship that would justify preclusion, and whether preclusion, with its severe consequences, would be fair under the particular circumstances. Doubts should be resolved against imposing preclusion to ensure that the party to be bound can be considered to have had a full and fair opportunity to litigate.
For present purposes, Bain and Gilfillan were in privity with their former law partner, Rhodes, as he was a co-signatory to the fee agreement and co-beneficiary to the trust proceeds arising from the fee agreement. Considering the facts and realities of the matters before us, we agree with the Appellate Division that defendants should be deemed to be in privity with Rhodes for purposes of litigating the validity of their fee arrangements as embodied in the trust. Defendants' rights to receive payments were coextensive with Rhodes' and derived from the identical arrangement entered into when the three were law partners. As the Appellate Division concluded, "[a]s partners in the law firm that entered into the fee agreement with plaintiffs, [Bain and Gilfillan's] right to receive trust income stands or falls with the contract." (Supra, 275 AD2d, at 74.) Indeed, defendants themselves recognized that adjudication of Rhodes' conduct as a partner or agent of the law firm would have consequences for them. Defendants' interests were aligned with Rhodes' with respect to the lawfulness of the fee arrangements where millions of dollars were at issue. Thus, it is appropriate to bind them by the judgment in Rhodes under the doctrine of collateral estoppel.
Defendant trusteesparties to the Rhodes action with notice of the issues to be decided in that caseacknowledged that they were themselves "unclear as to how the wording of portions of the counterclaim [could] be so narrowly construed" to exclude them. Given these facts, as a policy matter we agree with the Appellate Division that a "party to a lawsuit cannot sit by idly while a contract, to which he is also a party, is judicially construed without being precluded by the result" (id.).
Knowing that the validity of the trust was being vigorously contested in Rhodes, and knowing the potential serious adverse consequences of the litigation, in this particular case it is appropriate to deem defendants' interests represented by Rhodes. Defendants cannot be rewarded for their conscious, tactical decision not to take a more active role in that litigation by now allowing the very same issues and facts to be relitigated. A *306 contrary determination would undermine a policy interest that is at the heart of collateral estoppeldiscouraging relitigation of issues and the potential for inconsistent outcomes.
We turn next to whether the two basic requirements for collateral estoppel have been met.
A comparison of the issue raised in the present action with the issue raised in the Rhodes action reveals that the identical issue was already litigated and decided. In the Rhodes action, Supreme Court determined, after extensive pretrial and trial proceedings, that the original fee agreement was unlawful as it was procured in violation of the canons of ethics. Supreme Court further concluded "that with regard to fees, the Trust Agreement merely recodified the prior fee arrangements entered into" and that because "[plaintiffs] did not have the benefit of truly independent counsel and were never instructed to seek [independent legal] advice * * * the trust agreements are rescinded." This is the very issue that defendants seek to relitigate in the present action hoping that the second time around a court will reach a contrary determination.
Defendants, moreover, have failed to establish the lack of a full and fair opportunity to litigate the validity of the fee agreement in the Rhodes action. Because defendants were in privity with Rhodes, the critical question is whether Rhodes had a full and fair opportunity to litigate the issue (see, D'Arata v New York Cent. Mut. Fire Ins. Co., supra, 76 NY2d, at 666). We conclude that he did. In extensive proceedings, Rhodes vigorously defended the validity of the trust. Moreover, as noted by the Appellate Division, defendants were not just nominal parties but, as trust beneficiaries, were essential parties whose rights were affected by the outcome of the Rhodes action. The record reflects that defendants produced documents for the litigation, received copies of select documents used in the trial (including deposition transcripts), and agreed to testify as witnesses on behalf of Rhodes before changing their minds at the last minute.
Defendants make much of the fact that Supreme Court denied plaintiffs' motion to amend their counterclaims to assert claims against defendants. While true, this fact does not undermine the holding of Rhodes which disposed of the essential claim in the instant action in holding the fee agreement was unenforceable. All that denial of the motion to amend guaranteed was that defendants would not be subject to a monetary judgment in the Rhodes action. Additionally, it was *307 defendants who beseeched the trial court to stay this action pending a determination in Rhodes, fully intending to invoke the benefits of the judgment if the outcome was favorable to them. Although, as the dissenting opinion points out, abolition of the mutuality of estoppel doctrine authorizes such use of issue preclusion, nothing in our case law correspondingly prohibits taking this fact into account in analyzing whether defendantsparties in the Rhodes action who had notice of all the proceedingsshould be bound by a determination against one with whom they are united in interest as to the particular issue.[*] Moreover, it was defendants who vigorously opposed the expansion of the Rhodes case to include specific claims by Buechel and Pappas against Bain and Gilfillan. Defendants based their opposition on the prospect of additional delay in the Rhodes litigation.
Finally, defendants' claim that the present matter is subject to exclusive Federal jurisdiction is without merit. This case is not preempted by patent law because plaintiffs, the inventors, did not plead any substantive questions of patent law as an element of the claims asserted against defendants. A case arises under patent law "when `a well-pleaded complaint establishes either that federal patent law creates the cause of action or that plaintiff's right to relief necessarily depends on resolution of a substantial question of federal patent law, in that patent law is a necessary element of one of the well-pleaded claims'" (Kroll v Finnerty, 242 F3d 1359, 1363 [Fed Cir 2001]). Here, we agree with the determination of Supreme Court that this case does not sound in patent law because the "interpretation of the patent law on issues of patent priority and infringement [is] hardly at issue." Further, Federal patent statutes do not preempt State law in this case (see, 37 CFR 10.1 [stating that nothing in the code "shall be construed to preempt the authority of each State to regulate the practice of law, except to the extent necessary for the Patent and Trademark Office to accomplish its Federal objectives"]). Nor do lower court decisions invalidate a patent attorney's right to *308 receive an interest in a client's patent as full or partial payment (see, 37 CFR 10.64 [a] [3]).
Rather, this case addresses the necessary disclosures attorneys must make and the ethical obligations they must maintain in the course of their interaction with clients. Although Federal patent law recognizes that attorneys may receive an interest in patents in lieu of traditional fee arrangements, the need for disclosure mandated by the Code of Professional Responsibility governing the practice of law in this State is not obviated (see, 37 CFR 10.1; see also, Kroll v Finnerty, supra, 242 F3d, at 1364-1365).
The basic problem with the dissent is that it does not acknowledge that the Rhodes judgment rescinded Rhodes' interest in the trusts because it found that the agreements from which the interest arose were invalid. Supreme Court stated: "[It is] ORDERED, ADJUDGED AND DECREED that since all of the agreements which purport to provide for compensation for legal services, by the payment of money or by providing an interest in any trust * * * were entered into in violation of the ethical duties owed by attorneys to their clients, the relief sought in the Third Counterclaim in the Verified Amended Answer to Third Amended Complaint * * * is granted, thereby terminating and rescinding, [ab] initio, any interests Rhodes holds, or may have held, in Trusts I and II." Plaintiffs here raise a question that has already been adjudicated, specifically, whether the fee agreement is invalid as resulting from a breach of duty by attorneys to their clients.
The dissent also misconstrues the test for privity that the Court employs. We do not adopt the so called "Virtual Representation Doctrine." That doctrine states that a nonparty may be bound by the results of a trial where the nonparty has sufficient ties to a litigant.
"Virtual representation demands the existence of an express or implied legal relationship in which parties to the first suit are accountable to nonparties who file a subsequent suit raising identical issues. In reviewing cases decided under the doctrine, we have described the types of relationships contemplated: `estate beneficiaries bound by administrators, presidents and sole stockholders by their companies, parent corporations by their subsidiaries, and a trust beneficiary by the trustee'. Southwest Airlines Co. v. Texas Intern. Airlines, 546 F.2d *309 84, 97 (5th Cir. 1977)" (Pollard v Cockrell, 578 F2d 1002, 1008-1009 [1978]).
Moreover, Green v Santa Fe Indus. (70 NY2d 244 [1987]) is clearly distinguishable. There this Court held that an action by former minority stockholders against several corporations for breach of fiduciary duty was not barred by collateral estoppel. In Green, the only relationship between the party to be bound, and against whom the issue was decided, "was that they owned separate blocks of stock in the same company." (Id., at 254.) Plaintiffs were not litigants in the prior Federal action and were determined by this Court not to be in privity with plaintiffs in that action. Here, by contrast, the relationship between defendants and Rhodesformer partners and co-trustees entitled to trust funds based on the identical fee agreementcoupled with defendants' litigation posture, compel a different result.
In the end, we cannot agree with our dissenting colleague that defendants' strategy was "understandable and legitimate" (dissenting opn, at 316). Rather, we agree with the trial court and the unanimous Appellate Division that defendants, as parties to the action, were well aware that their own fee agreements were being challenged and construed, and they had an obligation to take an active role in that litigationwhich went on for nearly a decadeor accept the consequences. Indeed, the record shows that defendants themselves knew of the potential costs of their gamble. Our holding makes plain that the law will not sanction such tactical maneuvering at the price of efficiency and consistent judgments where parties have not shown that they lacked a full and fair opportunity to be heard.
Accordingly, the order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative.
LEVINE, J. (dissenting).
I respectfully dissent. In this case, the majority upholds the application of collateral estoppel to bar defendants from litigating an issue that had been resolved, not against them, but against a third party, at a prior trial. The majority so holds notwithstanding that the judge in that trial had ruled that it would have been unfair to bring them in as actual parties for the litigation of that issue in that forum. This anomalous (to say the least) result is purportedly reached by the majority on the ground that defendants were in privity with the losing party in the prior action. Nevertheless, the *310 majority's writing is laced with party preclusion concepts, and it quotes approvingly from the portion of the Appellate Division's decision relying on that ground for preclusion. Thus, I will address both grounds, each of which is unsoundly applied here.

Party Preclusion
Defendants' former law partner, R. Gale Rhodes, commenced the prior action in 1987 against plaintiffs as trustees of two trusts, the corpuses of which were patents covering prosthetic devices plaintiffs had invented. Plaintiffs were the named trustees and each a one-third beneficiary in the two trusts. Rhodes and defendants were each a one-ninth beneficiary of the total royalty income derived from the patents held in "Trust I." Their beneficial interests accorded with the terms of a 1974 retainer agreement the plaintiffs had signed when Rhodes' and defendants' law firm undertook to provide the legal services for obtaining those patents, mostly accomplished before Rhodes withdrew from the firm in 1981. Rhodes, but not defendants, was a beneficiary of "Trust II," compensating him for patent-related legal services to plaintiffs after he left the firm.
Count I of Rhodes' complaint pertained exclusively to plaintiffs' alleged breaches of fiduciary duty as the trustees of Trust I. He charged that plaintiffs unlawfully diverted and mishandled trust income for their own personal interests. Rhodes sought an accounting from plaintiffs and that they be personally surcharged and removed as trustees. As beneficiaries of Trust I, defendants would have been directly affected by the relief Rhodes requested. Hence, they concededly were necessary parties as to that cause of action, and Rhodes joined them as "defendant-beneficiaries" in response to plaintiffs' motion to dismiss based upon nonjoinder. It is uncontroverted that they did not actively participate in the lawsuit, however.
Some four years after Rhodes initiated suit, plaintiffs, as individuals, interposed five counterclaims against him alone. Their third counterclaim sought ab initio rescission of Rhodes' interest in Trust I, on the ground that, as their attorney in processing the applications for the patents held in the trust, he had a conflict of interest and breached his fiduciary duty to them by inducing them to enter into a retainer agreement giving him a proprietary interest in their inventions. Four years later, plaintiffs sought for the first time to amend their answer to extend that counterclaim to defendants. That motion was denied.
*311 Plaintiffs then brought this separate action against defendants, which was stayed while Rhodes' suit proceeded to trial. The trial concluded with a judgment in plaintiffs' favor on their third counterclaim.
On the foregoing procedural facts, the majority agrees with the Appellate Division that defendants are collaterally estopped, on the basis of their presence as "essential parties" in the prior action (i.e., party preclusion), from defending the validity of their interests in Trust I. The majority quotes with approval the Appellate Division's statement that "a `party to a lawsuit cannot sit by idly while a contract, to which he is also a party, is judicially construed'" (majority opn, at 305 [emphasis supplied]).
There are two fatal factual flaws in the foregoing reasoning, as a close examination of the pleadings and procedural history of the prior suit discloses. First, defendants were not parties to the entire prior litigation. Rhodes merely joined them as trust beneficiaries on his claim in Count I of his complaint. That cause of action related solely to alleged misconduct of plaintiffs as trustees of Trust I. In defending against Rhodes' claim in Count I, plaintiffs neither placed in issue the validity of Trust I nor defendants' status as trust beneficiaries. Then, in counterclaiming individually (not as trustees) against Rhodes to rescind only his beneficial interests in Trust I and Trust II, plaintiffs again refrained from challenging the validity of Trust I or defendants' beneficial interests in it. Had they done so, obviously, defendants would have been necessary parties to the counterclaim, requiring cross-claim joinder by plaintiffs, just as joinder had been required on Rhodes' Count I cause of action (see, CPLR 3019 [b]; Siegel, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR 3019, at 216).
Furthermore, in the former litigation, plaintiffs themselves must have determined that defendants' nominal party status on Rhodes' Count I cause of action was insufficient to bind them conclusively to any judgment favorable to plaintiffs on their third counterclaim. Otherwise, plaintiffs would not have moved to join defendants on the counterclaim, a totally unnecessary procedure if the litigation on the counterclaim with Rhodes alone would have preclusive effect on defendants.[1] Plaintiffs, not defendants, were the parties who "s[at] by idly" *312 through eight years of the litigation, including protracted discovery, before attempting to join defendants as parties to the counterclaimthe procedural relief necessary to give the adjudication on their counterclaim in the Rhodes action preclusive effect against defendants.
The majority's further conclusion, that defendants, as "parties to the Rhodes action with notice of the issues to be decided in that case" (majority opn, at 305), had a full and fair opportunity to litigate the validity of Trust I and of their rights under it, is also unsupported by the record and contrary to our collateral estoppel jurisprudence. The trial judge in the prior action denied plaintiffs' 1995 motion to amend their answer to extend their third counterclaim to defendants. That ruling, which was not appealed, was based in part on findings that the request came after "the note of issue was filed following protracted discovery," and that to grant the request would have either curtailed necessary additional discovery, or further delayed the trial of "this eight year old lawsuit."
New discovery would have been vital to all parties and especially defendants, if they had been joined on the counterclaim, because their affidavits herein show that they had extensive dealings with plaintiffs separate from Rhodes, both before and after his withdrawal from the law partnership. Of particular importance in this regard, defendants have averred that, independently of Rhodes, at or near the inception of the lawyer-client relationship, they advised plaintiffs of the potential conflict of interest and to seek independent counsel regarding the parties' proprietary interests/contingent fee arrangement. Indeed, the majority finds especially critical that Rhodes failed to so address plaintiffs at the time of the proposed incorporation of Biomedical Engineering Corporation (BEC) which resulted in "converting the one-third interest in a single invention into a one-third equity interest in a corporation that would exploit all future inventions" (majority opn, at 299). While Rhodes conceded never giving such advice, defendant Bain stated in a sworn affidavit in this action:
"At this point and before the corporation was formed, I personally undertook to advise Buechel and Pappas that they should consult an independent attorney with respect to their dealings with us *313 which now was in the nature of a business rather than legal representation alone. I did this on two separate occasions in 1974 in our law offices. On one occasion I was alone with Buechel and Pappas and on the other Gilfillan, Buechel, Pappas and I were present. On each occasion, I explained to them that there was an inherent conflict of interests in the proposed relationship. I also explained to them that they should seek independent counsel and could seek our services from other attorneys."
It would seem self-evident that, had the Rhodes trial court granted the motion to join defendants on plaintiffs' counterclaim and then ordered that the trial proceed expeditiously, the resultant curtailment of defendants' right to engage in discovery would have denied them a full and fair opportunity to defend the validity of their beneficial interests in Trust I. Surely, then, the total absence of participation, including the entire loss of opportunity for discovery, occasioned by the Rhodes v Buechel trial court's refusal to grant plaintiffs' motion to join defendants on their counterclaim, must also be a denial of a full and fair opportunity to litigate.
The majority also disregards entirely our precedents holding that a party is denied a full and fair opportunity to litigate in a prior action when "a practical inquiry into `the realities of litigation' " reveals that the party lacked any serious incentive to fully and vigorously participate (Gilberg v Barbieri, 53 NY2d 285, 292). Under the uncontested facts in the record in Rhodes v Buechel, defendants had every disincentive to fully litigate there the issue of the validity of Trust I and of their beneficial interests in it.
First, they were unwilling participants in that action, joined only as "defendant-beneficiaries" when plaintiffs moved to dismiss Rhodes' complaint for failure to join them as necessary parties. Second, it is entirely undisputed that, until the falling out between plaintiffs and defendants in 1995, leading quickly to plaintiffs' motion to amend the answer to force defendants' active trial participation on the issues raised by their counterclaim, defendants continued to furnish legal services to plaintiffs and the trust and to regularly receive from plaintiffs as trustees their fractional share of the substantial trust income. Third, defendants had no direct stake in the outcome of the Rhodes suit. Plaintiffs' counterclaim unequivocally sought only to invalidate Rhodes' interests in Trust I because *314 of his breach of fiduciary duty.[2] Indeed, in their affirmative defenses, plaintiffs relied upon provisions of the trust instrument and upon defendants' approval, in their capacities as trust beneficiaries, of plaintiffs' conduct as trustees. Certainly then, through the nearly eight years of litigation prior to plaintiffs' 1995 motion to amend the counterclaim, the last thing defendants would have wanted was the conversion of their harmonious lawyer/client, trustee/beneficiary relationships with plaintiffs into a fully adversarial one in the Rhodes v Buechel litigation.
It follows from the foregoing that here, even more than in Staatsburg Water Co. v Staatsburg Fire Dist. (72 NY2d 147, 154), defendants were "[a]t most * * * interested, albeit unwilling participant[s]" in the prior action. Likewise, "the lack of any direct stake in the outcome of the proceeding left defendant[s] with little incentive to fully litigate the issue" (id.). Thus, even if it could be argued here that defendants were "granted the opportunity to participate [in the Rhodes litigation], this did not necessarily amount to a full and fair opportunity to contest the determination" (id.).
Apparently addressing the total absence of defendants' incentive to litigate plaintiffs' counterclaim in Rhodes v Buechel, the majority relies upon a January 1995 letter from defendant Gilfillan to plaintiffs' counsel in which he questioned "`whether or not we must become active in the Rhodes litigation to protect our rights'" (majority opn, at 301). The majority implies that this letter demonstrated that defendants anticipated the preclusive effect of a judgment in plaintiffs' favor on their counterclaim. There are two short answers to that suggestion.
First, the issue raised by defendants in that letter had no relationship whatsoever to plaintiffs' counterclaim. It concerned whether, under the terms of Trust I, the legal fees paid to *315 outside counsel in a specific foreign litigation, the "Link suit," regarding one of the trust's patents were chargeable to the lawyers/beneficiaries rather than "considered to be out-of-pocket expenses or disbursements [of the trusts]." That issue directly pertained to the kind of trustee misconduct alleged in Rhodes' Count I of the complaint, to which defendants were nominal parties. Defendants, on that issue, could very well have been apprehensive as to whether they should participate in the Count I litigation in Rhodes v Buechel to protect their rights "vis-à-vis the position of the Trustees regarding [outside counsel] legal fees." Plaintiffs' counterclaim, on the other hand, dealt with the entirely separate issue of Rhodes' misconduct as their attorney.
Even if the majority's implication that defendants' letter demonstrated their apprehension as to the preclusive effect of a judgment on the counterclaim in the former action is a fair one (which it is not), it would not be sufficient to establish an incentive to litigate on the part of defendants in their individual capacity in the Rhodes v Buechel action. As we said in Staatsburg Water Co., "it would be * * * fundamentally unfair to give preclusive effect to a determination where the only incentive to litigate stems from its potential collateral effects. Such a ruling would ill serve the litigation-limiting purposes of collateral estoppel" (id., at 155 [emphasis supplied]).
Defendants' disincentive to fully litigate their rights under Trust I in the Rhodes v Buechel case did not cease when hostilities between them and plaintiffs arose in 1995, followed promptly by plaintiffs' motion to amend their counterclaim in Rhodes. These developments occurred after protracted discovery and the filing of the note of issue, when the trial of the action was imminent. As previously discussed, to enter the litigation at that point would have entailed waiver of the opportunity to engage in full discovery, a great handicap for defendants.
Moreover, there was an even more imperative strategic reason for defendants to avoid joinder on the counterclaim in Rhodes v Buechel, derived from New York's earlier abandonment of the mutuality of estoppel doctrine. Prior to B.R. DeWitt, Inc. v Hall (19 NY2d 141), New York ostensibly adhered to the "so-called rule of mutuality of estoppel, [which provided that] unless both parties [to the subsequent action] are bound by the prior judgment, neither may use it" (id., at 144). In B.R. DeWitt, however, we announced that the "`doctrine of mutuality' is a dead letter" (id., at 147) and that, henceforth, collateral estoppel could be invoked, either defensively or offensively *316 by a nonparty to the prior litigation, providing that the requirements for collateral estoppel (identity of issues and full and fair opportunity to litigate) were met as to the party sought to be precluded (see, id., at 148).
There being no mutuality of estoppel, defendants had everything to lose and nothing to gain from active participation in the counterclaim litigation regarding the validity of the 1974 retainer agreement and of their beneficial interests in Trust I. Had those issues been resolved against plaintiffs on their counterclaim in Rhodes, defendants could have used the judgment defensively in any subsequent suit by plaintiffs, such as the instant one, to preclude plaintiffs from attacking the validity of the retainer and trust instruments. On the other hand, as nonparties to the counterclaim litigation in Rhodes, defendants ordinarily would not be bound by a disposition of that counterclaim favorable to plaintiffs.[3]
Refraining from active participation in the trial of the issues raised by plaintiffs' counterclaim in the Rhodes case, was, thus, a completely understandable and legitimate strategy for defendants. The umbrage against defendants taken by the majority and the Appellate Division for "sit[ting] by idly" in implementation of that strategy is better directed at this Court's abandonment of the mutuality of estoppel doctrine, not at defendants for taking advantage of that abandonment.

Privity
The majority's primary ground for imposing issue preclusion here is on the basis of defendants' privity with Rhodes in the Rhodes v Buechel case. In adopting that theory, the majority applies a standard which is contrary to our precedents, is of highly dubious constitutionality and will create uncertainty of application destructive to the litigation-limiting purposes of collateral estoppel.
Our courts, adhering to the approach of the Restatement (Second) of Judgments (Introductory Note, ch 4, at 344), have identified three general categories of privity that have been applied to collaterally estop a nonparty in a subsequent suit *317 involving the same issue. Privity will be found if the nonparty (1) "ha[s] a relationship with a party to the prior litigation such that his own rights or obligations in the subsequent proceeding are condition[al] * * * or derivative of, the rights of the party to the prior litigation" (D'Arata v New York Cent. Mut. Fire Ins. Co., 76 NY2d 659, 664; see, Matter of Juan C. v Cortines, 89 NY2d 659, 667); (2) controlled or substantially participated in control of the prior action (see, David v Biondo, 92 NY2d 318, 323-324; Matter of Juan C., supra; Watts v Swiss Bank Corp., 27 NY2d 270, 277-278; Restatement [Second] of Judgments § 39); or (3) had its interests represented by the losing party in the prior litigation (see, Matter of Juan C. v Cortines, supra, at 668; Restatement [Second] of Judgments § 41). Defendants fall into none of these categories.
There is no tenable basis to find that defendants' rights in the instant action are conditional or derivative of Rhodes' rights in the prior litigation. In this respect, this case contrasts decisively with D'Arata v New York Cent. Mut. Fire Ins. Co. (supra), a quintessential derivative or conditional rights privity case. There, the injured victim of an assault asserted a claim against the liability insurance carrier of the perpetrator solely as a subrogee of the insured's rights under the policy. As the insured's subrogee, of course he was "subject to whatever rules of estoppel would apply to the insured" (id., at 665).
At stake here, according to the relief requested in plaintiffs' complaint, are defendants' beneficial interests in Trust I. Clearly and unmistakably, plaintiffs' Rhodes v Buechel counterclaim was related exclusively to Rhodes' interests in that trust. The trust agreement itself defines the interests of each beneficiary separately and distinctly from the others. Moreover, that instrument required defendants, but not Rhodes, to provide legal services with respect to enforcement or defense of the patents held in the trust. Defendants' juridical relationships and rights under the trusts were thus separate and, in some aspects, quite different from Rhodes' interests.
The fact that Rhodes and defendants were law partners when the 1974 retainer agreement was entered into does not alter the conclusion that defendants' rights were not conditional or derivative of those of Rhodes in the prior litigation over plaintiffs' counterclaim. As the majority points out, the original retainer agreement had been superseded and broadened twice thereafter and no longer defined the rights of any of the parties. Furthermore, even if the retainer agreement had been in effect *318 when plaintiffs' counterclaim was interposed, plaintiffs did not choose to assert any claim against the partnership as such or sue Rhodes in any representative capacity as a partner, and did not join or serve defendants, Rhodes' partners, as parties. Under such circumstances, the judgment against Rhodes on the counterclaim would not have had any preclusive effect regarding the personal liability of defendants (see, CPLR 1025, 1501; Alexander, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR C1025:1, at 257; CPLR 1501, at 592). The fact that defendants, as law firm members, might be bound by Rhodes' conduct during the existence of the partnership would have potential relevance to the merits of this action but, as the foregoing authorities establish, not to any preclusive effect of the judgment against Rhodes on the counterclaim in which defendants were not joined as party litigants.
Nor can privity be established here because defendants controlled or substantially participated in control of Rhodes' defense to plaintiffs' counterclaim. There is not a scintilla of evidence that defendants and Rhodes shared key litigation decisions in defending against the counterclaim, such as choice of counsel, legal strategy, presentation of evidence or the order of proof. At most, they sporadically cooperated with Rhodes following plaintiffs' failed attempt to join them on the counterclaim. Even a nonparty's energetic cooperation or assistance, such as testifying as a witness in the prior suit, is insufficient to establish the requisite control (see, David v Biondo, supra, 92 NY2d, at 324; see also, Bigelow v Old Dominion Copper Min. & Smelting Co., 225 US 111, 126, abrogated on other grounds by Parklane Hosiery Co. v Shore, 439 US 322, 326-333 [recognizing the abandonment of the doctrine of mutuality of estoppel]). "To have control of litigation requires that a person have effective choice as to the legal theories and proofs to be advanced [on] behalf of the party to the action. He must also have control over the opportunity to obtain review" (Restatement [Second] of Judgments § 39, comment c).
Privity likewise cannot be based on the theory that Rhodes represented defendants' interests on the counterclaim in Rhodes v Buechel. Rhodes had no fiduciary or other legal obligation to act on defendants' behalf in defending against plaintiffs' counterclaim, which implicated only his own interests (see, Restatement [Second] of Judgments § 41 [1]). Nor did Rhodes undertake or assume any de facto responsibility to represent defendants' interests in defending against the counterclaim (cf., Matter of Slocum [Nathan A.] v Joseph B., 183 AD2d 102, 104).
*319 The record is devoid of any evidence that Rhodes would have been motivated to protect defendants' interests, or that he did so in the prior litigation. The law partnership broke up acrimoniously in 1981. Unquestionably, from Rhodes' initiation of suit in 1987 until 1995, while defendants continued to provide legal services to plaintiffs both individually and as trustees of Trust I, the former partners' interests were antithetical. In fact, after plaintiffs' counterclaims were interposed, Rhodes threatened defendants that he would cross-claim against them. Rhodes would not have had any incentive to proffer evidence of separate lawyer-client relations between plaintiffs and defendants, proof of which might have mitigated or negated the taint of any alleged breach of professional fiduciary duty under the 1974 retainer agreement (see, Bain affidavit, supra).
In actuality, the majority does not rely upon any of the traditional privity grounds. The majority's theory of privity is explained instead as follows: "defendants should be deemed to be in privity with Rhodes for purposes of litigating the validity of their fee arrangements as embodied in the trust [because their] rights to receive payments were coextensive with Rhodes' and derived from the identical arrangement entered into when the three were law partners," and "[d]efendants' interests were aligned with Rhodes' with respect to the lawfulness of the fee arrangements" (majority opn, at 305 [emphasis added]).[4]
Although the majority agrees that privity preclusion is dependent upon "whether the party sought to be bound and the party against whom the litigated issue was decided have a relationship" (id., at 304-305 [emphasis added]), they have not identified any formal or even informal relationship which existed between Rhodes and defendants when plaintiffs' counterclaim was litigated. For the majority, it is entirely sufficient to establish privity that the rights of the losing litigant and the nonparty were coextensive, derived from the same source, and *320 "aligned," i.e., substantially identical. Notice to nonparties that their interests are to be adjudicated is not deemed necessary. Nor is the losing party required to have assumed a duty of representation.
The majority's rationale, thus, amounts to nothing more than an application of the broad-form "Virtual Representation Doctrine" which had a vogue in some Federal circuits for a period of time (see, Richards, Richards v Jefferson County: The Supreme Court Stems the Crimson Tide of Res Judicata, 38 Santa Clara L Rev 691, 706-710 [1998]; Johnson, Due or Voodoo Process: Virtual Representation as a Justification for the Preclusion of a Nonparty's Claim, 68 Tul L Rev 1303, 1318-1320 [1994]). Under the expansive version of that doctrine, "a person may be bound by a judgment even though not a party if one of the parties to the suit is so closely aligned with his interests as to be his virtual representative" (Aerojet-General Corp. v Askew, 511 F2d 710, 719, cert denied sub nom. Metropolitan Dade County v Aerojet-General Corp., 423 US 908 [emphasis added]). A leading text on Federal procedure states that "[t]he broadest form of [the virtual representation] theory would preclude relitigation of any issue that had once been adequately tried by a person sharing a substantial identity of interests with a nonparty" (18 Wright, Miller & Cooper, Federal Practice and Procedure § 4457, at 494 [emphasis supplied]).
This Court should not adopt any such version of virtual representation, permitting preclusion merely because an issue "had once been adequately tried by a person sharing a substantial identity of interests with a nonparty" (id.). First, it plainly is inconsistent with our own precedents. In Green v Sante Fe Indus. (70 NY2d 244), the Court considered the preclusive effect of an action commenced in Federal court. The defendant parent corporation had utilized Delaware's "short-form, freeze-out merger" procedure (id., at 249) to acquire all remaining outstanding shares of its subsidiary. A member of the five percent minority class of shareholders in the subsidiary brought the action in Federal court alleging, among other things, a breach of fiduciary duty to minority shareholders in offering them an unfairly low price for their shares. The Federal suit was ultimately dismissed. The action in Green was commenced in our State courts by other shareholders of the same minority class seeking to attack the same transaction. It was undisputed in Green that the minority shareholder plaintiffs in the Federal suit had "made claims identical in legal theory to those plaintiffs assert here" (id., at 252 *321 [emphasis supplied]). Additionally, the same counsel represented the complaining minority shareholders in each action. In Green, our Court rejected the application of privity to preclude the shareholders who were not parties to the Federal suit and instead decided the case on the merits.
Green v Sante Fe Indus. is virtually indistinguishable from the instant case with respect to the criteria relied upon by the majority to find privity here. In Green, the rights of the minority stockholders who sued in Federal court and those who sued in New York Supreme Court were truly coextensive. Plaintiffs in both suits were members of the same class of minority shareholders; their shares of corporate stock were identical choses in action; their theory of recovery was identical, as was their legal representation. The causes of action asserted in the Federal and State courts arose out of the identical transaction the use of the Delaware short form freeze-out merger procedure to eliminate their minority interests. We soundly rejected privity in Green. The Federal plaintiffs had not purported in any way to represent the State plaintiffs, nor had the Federal court in any way undertaken adjudication of the latter's interests. The rejection of privity in Green should be a fortiori controlling here.
The broad virtual representation standard for privity applied by the majority is based solely on coextensiveness (i.e., substantial identity) and alignment of the interests of the parties in the successive litigations, and offends traditional notions of due process guaranteeing that parties must have their day in court before their rights are adjudicated (see, Johnson, 68 Tul L Rev, supra, at 1323-1325).
That is why the Federal courts subsequently retreated from applying a broad virtual representation doctrine, holding that it would "transgress the bounds of due process" to base privity solely on the identity of party and nonparty interests, legal positions or the need to prove the same set of facts (Hardy v Johns-Manville Sales Corp., 681 F2d 334, 340 [5th Cir]). Those courts that previously applied only the foregoing virtual representation criteria for privity purposes now further require "the existence of an express or implied legal relationship in which parties to the first suit are accountable to non-parties who file a subsequent suit raising identical issues" (Pollard v Cockrell, 578 F2d 1002, 1008 [5th Cir] [emphasis supplied]; see, Hardy v Johns-Manville Sales Corp., supra, at 340).
Richards v Jefferson County (517 US 793) also represents a rejection of privity preclusion as violative of due process when *322 it is based solely on the fact that the party's and nonparty's "respective interests [in the successive litigations] were `essentially identical'" (id., at 796). The factors which the Court weighed in Richards were, first, that the parties to the prior suit never gave the petitioners (the plaintiffs in the suit before the Supreme Court) notice that the earlier case "would conclusively resolve their legal rights" (id., at 799). Second, and even more crucial, the plaintiffs in the first suit "did not sue on behalf of a class; their pleadings did not purport to assert any claim against or on behalf of any nonparties; and the judgment they received did not purport to bind any * * * nonparties" (id., at 801). Thus, the Supreme Court concluded, the nonparties to the prior litigation were not represented adequately there to meet the requirements of due process, despite the identity of their interests and those of the plaintiffs in the first action.
Defendants here fall squarely under the factors relied upon in Richards to find a due process violation. Never were they put on notice that their interests in Trust I would be adjudicated in the resolution of plaintiffs' counterclaim in Rhodes v Buechel. Indeed, the denial of plaintiffs' motion to add them as parties in the counterclaim litigation sent the diametrically opposite message.[5] Moreover, nowhere in the record is there any indication that, in defending against the counterclaim in that action, Rhodes purported to represent defendants' interests.
Thus, as in Richards, there was no full and fair consideration of defendants' individual interests in the Rhodes v Buechel case. That is because, especially after the trial court rejected plaintiffs' motion to join defendants on their counterclaim, "there is no reason to suppose that the [Rhodes] court took care to protect the interests of [defendants] * * * [n]or is there any reason to suppose that [Rhodes] understood [his] suit to be on behalf of [defendants]. Thus, to contend that [Rhodes] somehow represented [defendants], let alone represented them in a constitutionally adequate manner, would be `to attribute to [him] a power that it cannot be said that [he] had assumed to exercise'" (id., at 802).
*323 Finally, in addition to its unconstitutional application here, the broad "coextensive rights" standard announced in this case to find privity will inevitably inject elements of insecurity and uncertainty for nonparties who may be substantially interested in the issues in litigation to which the parties chose not to join them. Res judicata and collateral estoppel, because of their harsh results, however, are areas crying out for foreseeability and predictability. To avoid the risk of preclusion, interested nonparties will be forced to intervene in litigation to protect their rights. The imperative to intervene flowing from the majority's privity standard stands on its head the traditional rule "put[ting] the burden of joinder on the person who wishes to obtain the benefits of the rules of preclusion, requiring him to bring in third parties involved in the transaction. Hence, as between a silent bystander and the party to the prior litigation, the latter properly bears the risk that the original litigation will not terminate the controversy" (Restatement [Second] of Judgments § 62, comment a; see also, Chase Natl. Bank v City of Norwalk, 291 US 431, 441 [Brandeis, J.]; Johnson, 68 Tul L Rev, supra, at 1314-1315).
In presumptively forcing formal early intervention by an interested nonparty in pending litigation, the majority's privity rule "[will] ill serve the litigation-limiting purposes of collateral estoppel; it would simply encourage overlitigation at an earlier stage" (Staatsburg Water Co. v Staatsburg Fire Dist., supra, 72 NY2d, at 155). Therefore, I would vote to reverse and remit for trial on all issues.
Order affirmed, etc.
NOTES
[*] Further addressing the dissent, no one factor is determinative in our conclusion that defendants here were in privity with Rhodes. It is, rather, a confluence of factors that persuades us to affirm, including defendants' relationship with Rhodes vis-à-vis the fee arrangements, their involvement in the action, their awareness of issues that would be decided, and their acknowledged tactical decisions regarding the Rhodes litigation. Additionally, because we hold that collateral estoppel bars relitigation of the validity of the trust, defendants' conclusory affidavits (dissenting opn, at 312-313) are irrelevant in this action.
[1] This conclusion is confirmed by plaintiffs' averments in support of their motion to join defendants on the counterclaim that "[i]f the motion is denied, two full trials will be required to resolve the issues herein" (emphasis supplied). This is an unmistakable concession that party preclusion could not be applied against defendants on their counterclaim, solely based upon their joinder as nominal parties on Rhodes' Count I cause of action.
[2] The counterclaim never ascribes any breach of fiduciary duty to the Rhodes/defendants partnership or law firm as such, only to Rhodes individually. Thus, "Rhodes knew that the Agreements were unfair" (counterclaim para 93); "Rhodes, while acting as their attorney, induced Drs. Buechel and Pappas to enter into the unfair Agreements" (id., para 94); "In breach and violation of his duties under the Agreements, and of his fiduciary duties in connection therewith, Rhodes failed fully, properly, accurately and truthfully to advise Drs. Buechel and Pappas * * * " (id., para 97). Most crucially, the ad damnum clause of the counterclaim states: "By reason of his aforesaid conduct, including, without limitation, his overreaching while a fiduciary and his breach of his representations and warranties, Rhodes's interests in Trust I and Trust II should be terminated and rescinded" (id., para 107 [emphasis supplied]).
[3] Nonmutuality of estoppel, under which plaintiffs would be precluded in a subsequent litigation with defendants by an unfavorable disposition of their counterclaim in Rhodes v Buechel, but not vice versa, as to defendants, nonparties to this counterclaim, explains their averments supporting a stay of the instant action, relied upon by the majority (see, majority opn, at 301, 306-307). By no means can they be construed as an awareness that defendants would be bound by a resolution of the counterclaim favorable to plaintiffs.
[4] The majority finds a "basic problem" with the dissent in that it does not acknowledge that "the Rhodes judgment rescinded Rhodes' interest in the trusts because it found that the [fee] agreements from which the interest arose were invalid" (majority opn, at 308). That finding, however, has no significance for preclusion purposes absent an independent establishment of privity; it does not itself demonstrate that privity exists. Thus, the majority's point begs the question.

Also irrelevant is the majority's additional reliance on a portion of the Rhodes court's decision which "ordered that `the trust agreements are rescinded'" (majority opn, at 302). Defendants protested that ruling because plaintiffs "did not seek recission of the trusts themselves" (letter to Justice Lowe, Apr. 20, 1998), and it was removed from the final judgment.
[5] The concerns expressed by defendants to plaintiffs' counsel in response to Rhodes' threats to cross-claim for contributioni.e., that defendants were unclear whether the counterclaims could be interpreted as asserting claims against the former partners' law firmcannot be construed as an acknowledgment of the preclusive effect of the counterclaim litigation against defendants in their individual capacity. No cross claim was ever interposed against defendants either as Rhodes' partners or individually.